IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PAUL A. WESBECHER,

    Plaintiff,                   No. CIV S-01-2410 FCD DAD P

    vs.

STEPHEN D. LANDAKER, et al.,

    Defendants.             FINDINGS AND RECOMMENDATIONS

/

        Plaintiff is proceeding pro se with a civil rights action, which he commenced on December 31, 2001, pursuant to 42 U.S.C. § 1983. The operative complaint is plaintiff's second amended complaint, filed on January 8, 2003. Before the court is defendants' second motion for summary judgment.

I. Plaintiff's Allegations[1]

        Plaintiff claims that following his arrest on November 24, 2000, Chico Police Department officers, defendants Reichel and Krzyzek, used excessive force against him in violation of the Eighth Amendment. Specifically, plaintiff alleges as follows. On the night in question plaintiff was arrested by the defendants Reichel and Krzyzek, who cuffed his hands

---

[1] This summary of plaintiff's allegations from his second amended complaint is taken from the court's findings and recommendations filed on March 2, 2005 at 1-2.

1

behind his back and placed him in a police car for transport to the Enloe Medical Center for purposes of conducting a blood alcohol test. (2nd Am. Compl. at 6.) After parking near the emergency room entrance, defendant Reichel opened the left passenger door, grabbed plaintiff by the front of his shirt and yanked him out of the car. (Id. at 7.) As a result, plaintiff hit his head against the upper door jam of the vehicle. (Id.) While plaintiff was still handcuffed, defendant Reichel forced him out of the vehicle and threw him to the ground, breaking plaintiff's upper right arm. (Id.) Although both defendants Reichel and Krzyzek knew plaintiff's arm was broken, they nonetheless pulled plaintiff up from the ground by his left arm which was still handcuffed, causing further damage to the broken right arm. (Id.) The defendants then pushed plaintiff over the trunk of the police vehicle, causing yet further damage to his broken arm while ignoring plaintiff's complaints of pain. (Id.)[2]

        As a result of the injuries inflicted by the defendants plaintiff continues to experience pain and the use of his right arm is severely limited. (Id. at 14-15.)

II. Procedural History

        On February 12, 2003, the court determined that service was appropriate for defendants Reichel and Krzyzek with respect to plaintiff's excessive force claim.[3] On June 3, 2004, those defendants filed a motion to dismiss or, in the alternative, for summary judgment. On March 2, 2005, the undersigned issued finding and recommendations recommending that defendants' motion to dismiss due to plaintiff's failure to respond to discovery request be denied. With respect to the alternative motion for summary judgment, defendants had argued that this

---

[2] Plaintiff alleges that at his criminal trial on misdemeanor charges of resisting a police officer, the defendants falsely denied assaulting him. (2nd Am. Compl. at 17.) He also alleges that he did not resist the officers by pressing his head against the door jam of the police vehicle as they claimed because he could have only done so if he was being pulled from the vehicle in an unsafe manner. (Id. at 16-17.)

[3] The court also determined that service was in order for defendant Dr. Landaker on plaintiff's Eighth Amendment claim alleging inadequate medical care. However, on August 15, 2003, defendant Landaker filed a motion for summary judgment. On March 8, 2004, that motion was granted and defendant Landaker was dismissed from this action. (See Doc. No. 64.)

1  action was barred by the decision in Heck v. Humphrey, 512 U.S. 477 (1994).  However, the
2  undersigned found that the record was unclear regarding the evidence presented to the jury at
3  plaintiff's criminal trial and upon which the guilty verdict against him was rendered .  Therefore,
4  it was recommended that the summary judgment motion be denied without prejudice and that
5  defendants be granted leave to file a new motion for summary judgment based upon the
6  submission of additional records from the underlying state court criminal proceeding.  Those
7  findings and recommendations were adopted by the assigned District Judge on March 31, 2005.

III.  The Underlying Criminal Conviction

Plaintiff was charged in state court with two misdemeanors stemming from the incident in question.  Count one of the criminal complaint charged him with attempting to deter and prevent officers Reichel and Krzyzek from performing their duties by means of threats and violence in violation of California Penal Code § 69.[4]  (Decl. of Lisa Baker in Support of First Mot. to Dismiss/Mot. for Summ. J., filed June 3, 2004 (hereinafter "Baker Decl."), Ex. A (Misdemeanor Compl.) at 1-2.)  Count two charged him with resisting, obstructing or delaying officers Reichel and Krzyzek from discharging their duties in violation of California Penal Code § 148(a).[5]  (Id.)

On January 16, 2001, following a two-day trial and after approximately one-hour of deliberation, the jury returned guilty verdicts on both counts.  (Baker Decl., Exs. B and C.)

/////

---

[4] California Penal Code § 69 provides: "Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law, or who knowingly resists, by the use of force or violence, such officer, in the performance of his duty, is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in the state prison, or in a county jail not exceeding one year, or by both such fine and imprisonment."

[5] California Penal Code § 148(a)(1) provides: "Every person who willfully resists, delays, or obstructs any . . . peace officer . . . in the discharge or attempt to discharge any duty of his or her office . . . shall be punished by a fine . . . or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment."

3

IV. <u>The Arguments of the Parties</u>

    A. <u>Defendants' Second Motion for Summary Judgment</u>

In their second motion for summary judgment (hereafter, "MSJ"), defendants Reichel and Krzyzek again seek dismissal of plaintiff's civil rights action based on the holding in <u>Heck v. Humphrey</u>. Defendants advance four arguments in this regard. First, they contend that plaintiff's excessive force claim implicates the validity of his criminal convictions because a necessary element of the crime of obstructing a peace office (Penal Code § 148), is that the obstruction occurred while the officer was engaged in the lawful performance of his duties. (MSJ, Mem. P. & A. at 9.)[6] In this vein, defendants assert that were plaintiff successful on his excessive force claim it would invalidate his criminal convictions since that civil claim arises out of the same factual basis supporting his criminal convictions. (<u>Id.</u>)

Second, defendants argue that the <u>Heck</u> bar applies because plaintiff's convictions were based on his entire course of conduct leading up to the alleged use of excessive force by the officers rather than a single act on his part. (<u>Id.</u> at 10.) Defendants argue that in presenting its case on the charge of obstructing a peace officer, the prosecution properly offered evidence of the entire course of conduct engaged in by plaintiff and the jury in his criminal case was not required to determine which specific act or acts formed the basis for the convictions. (<u>Id.</u>) Here, defendants argue, all the acts underlying plaintiff's excessive force claim were presented as evidence of a violation of Penal Code § 148(a) and the jury was instructed that if the officers engaged in the use of excessive force, they were required to find plaintiff not guilty. (<u>Id.</u> at 11.)

Third, defendants argue that the jury was required to find plaintiff guilty of a course of conduct, rather than a single act, in order to convict him of violating Penal Code § 148(a) with respect to both officers. (<u>Id.</u> at 12.) As the defendants point out, while both officers

---

[6] Page references are to the numbers appearing at the bottom of each page of the memorandum of points and authorities and not to the numbers reflected by the court's CM/ECF system.

4

were identified in the criminal complaint filed against plaintiff, the record reflects that defendant Reichel was the only officer who pulled plaintiff out of the police car. Defendant Krzyzek's involvement did not begin until he struggled with plaintiff and bent him over the trunk of the car as plaintiff continued to be combative, belligerent and resistant. (Id.) This struggle with officer Krzyzek occurred only after plaintiff had broken his arm while being removed from the patrol car by defendant Reichel. Thus, defendants argue, in order to find plaintiff guilty of violating § 148(a) with respect to both Reichel and Krzyzek as they did, the jury in the criminal case had to find that plaintiff engaged in a course of conduct which resisted, delayed or obstructed both officers in their duties rather than in a single act of resistance. (Id. at 13.)

    Fourth, defendants argue that the evidence that plaintiff has pointed to in support of his excessive force claim, and in opposing summary judgment, is an entire course of conduct rather than a single act. (Id.) Defendants also contend that the evidence relied upon by plaintiff all relates to the same sequence of events which served as the factual basis for his criminal conviction. (Id.) Thus, defendants argue, this civil action necessarily implicates the validity of plaintiff's criminal convictions. (Id.) Moreover, to the extent plaintiff asserts that the reports by police and an emergency medical technician at the scene as well as their subsequent testimony were false or perjured, defendants note that the validity of the criminal convictions based on that evidence is again implicated by plaintiff's claims.[7] Finally, defendants argue that plaintiff has presented no evidence in opposition to their motion for summary judgment which does not
/////

---

[7] Defendants note in this regard that in the findings and recommendations filed on March 2, 2005 this court observed:

> If a new Motion for Summary Judgment is filed and the record establishes that the convictions were obtained in reliance of those witnesses' description of events, plaintiff may not attack that evidence in these proceedings. This is exactly what Heck bars.

(Findings and Recommendations at 19, n.13.)

5

impermissibly contradict or attack the testimony presented at his criminal trial and upon which his conviction was based. (Id. at 13-14.)

B. Plaintiff's Opposition

Citing the decision in Nonnette v. Small, 316 F.3d 872 (9th Cir.), cert. denied, 540 U.S. 1218 (2002), plaintiff argues that the holding in Heck v. Humphrey does not apply in this case because he has served his sentence and is now free on parole. (Opp'n at 4.)[8]

Next, plaintiff disputes defendants' contention that the same course of conduct underlies both his conviction for resisting, delaying and obstructing and this civil excessive force claim he has brought against the officers. (Id. at 7.) Plaintiff refers to the testimony during his criminal trial, arguing that his actions prior to arriving at Enloe Medical Center were the sole basis for his conviction on charges of threatening and obstructing officers. On the other, plaintiff argues, the use of excessive force by the officers occurred at the Medical Center when he was pulled out of the police car, picked up from the ground and bent over the police car. Plaintiff contends, therefore, that the actions underlying his excessive force claim do not imply the validity of his criminal convictions.

C. Defendants' Reply

Defendants argue that the decision in Nonnette does not preclude the application of the Heck bar in this case. They contend that in Nonnette, the parolee/plaintiff sought redress for the revocation of his good time credits and imposition of one hundred days of administrative segregation following a prison disciplinary proceeding. Since there were no collateral consequences as a result of the disciplinary conviction following plaintiff's release from prison, the court held that the plaintiff was not required to first obtain habeas relief before proceeding with his civil rights action. Defendants argue that here, in contrast to the situation in Nonnette,

---

[8] In this regard, plaintiff states that he served his sentences for violating California Penal Code §§ 148(a) and 69 at the Butte County Jail from November 24, 2000 until his release in July of 2001. (Opp'n at 4.) Following a parole violation, plaintiff was sentenced to prison for three years and was released on parole on March 1, 2003. (Id. at 5.)

6

plaintiff has admitted that he continues to suffer collateral consequences as a result of his criminal conviction and that he has continued to pursue habeas relief to overturn that conviction.

Defendants conclude that just as in cases such as Cunningham v. Gates, 312 F.3d 1148 (9th Cir. 2002) and Susag v. City of Lake Forest, 94 Cal. App. 4th 1401 (2002), plaintiff's conviction arises from the same acts upon which his civil claims of the excessive use of force are based and that the latter are therefore barred. (Reply at 10.)

V. Analysis

    A. The Heck Exception

The court will first consider plaintiff's argument that based on the holding in Nonnette v. Small, 316 F.3d 872 (9th Cir. 2002) and because he is no longer incarcerated, application of a Heck bar to this action is not appropriate. As one district court has recently observed in addressing an argument strikingly similar to that advanced by plaintiff here:

> In some exceptional situations, Heck may not bar a noncustodial plaintiff -- one to whom habeas corpus is not available because he is no longer "in custody" as required, see 28 U.S.C. § 2254 -- from proceeding with a civil rights action that, if successful, would imply the invalidity of an adjudicated offense.
>
> * * *
>
> The Ninth Circuit has interpreted Spencer as creating a limited exception to Heck, permitting some litigants who no longer may pursue habeas relief to bring collateral civil rights claims. See, e.g., Nonnette v. Small, 316 F.3d 872, 877-78 & nn. 6-7 (9th Cir.2002).
>
> But this exception is narrow, for it is limited to plaintiffs (1) who are "former prisoners challenging loss of good-time credits, revocation of parole or similar matters," id. at 878 n. 7, not collaterally challenging underlying criminal convictions, and (2) who diligently pursued "expeditious litigation" to challenge those punishments to the extent possible. See Guerrero v. Gates, 442 F.3d 697, 704-05 (9th Cir.2006) (comparing Nonnette, wherein the plaintiff diligently challenged administrative revocation of good-time credits, with Cunningham v. Gates, 312 F.3d 1148 (9th Cir.2002), wherein the plaintiff failed diligently to challenge an underlying criminal conviction).

El v. Crain ___F. Supp. 2d___, 2008 WL 2323524, *12 -13 (C.D. Cal. June 4, 2008).

Here, plaintiff does not qualify for an exemption from the application of Heck. First, the civil rights action before this court "would imply the invalidity of a criminal conviction, not a mere parole revocation or prison administrative decision." El v. Crain, 2008 WL 2323524 at *13. Moreover, in this case plaintiff's release from custody does not render moot any habeas proceedings challenging his underlying criminal conviction because, by his own admission, he remains under parole supervision and continues to suffer collateral consequences stemming from that conviction. See Jones v. Cunningham, 371 U.S. 236, 243 (1963) (a petitioner remains "in custody" for purposes of habeas jurisdiction while on parole); Goldyn v. Hayes, 444 F.3d 1062, 1064, n.2 (9th Cir. 2006) (same); see also Chaker v. Crogan, 428 F.3d 1215, 1219 (9th Cir. 2005) (recognizing "an irrefutable presumption that collateral consequences result from any criminal conviction" including a misdemeanor conviction) (citing Chacon v. Wood, 36 F.3d 1459, 1463 (9th Cir. 1994)). Finally, although plaintiff sought to collaterally attack his underlying state conviction is federal court, he did not do so expeditiously as required. In this regard, on January 19, 2006, his federal habeas petition challenging his state court conviction was dismissed for lack of prosecution and due to his failure to comply with court orders and rules. See Wesbecher v. Foy, No. Civ. S-04-0807 FCD-CMK (HC) (E.D. Cal.).[9] An earlier federal habeas petition filed by plaintiff with this court challenging the same conviction was also dismissed due to his failure to comply with the Local Rule requiring him to apprise the court of any change of address. See Wesbecher v. Benson, No. Civ. S-05-110 LKK-GGH P (HC) (E.D. Cal.). Having failed to pursue federal habeas relief in an expeditious manner, plaintiff cannot now argue that such relief is unavailable to him through no fault of his own. See Guerrero v. Gates, 442 F.3d 697, 704-05 (9th Cir. 2006); Cunningham v. Gates, 312 F.3d at 1153 n.3; Cole v. Doe 1 thru 2, 387 F. Supp. 2d 1084, 1092 (N.D. Cal. 2005) ("the Nonnette exception to Heck does not apply where the habeas remedy was lost as a result of the plaintiff's lack of diligence").

---

[9] A court may take judicial notice of court records. See MGIC Indem. Co. v. Weisman, 803 F.2d 500, 505 (9th Cir. 1986); United States v. Wilson, 631 F.2d 118, 119 (9th Cir. 1980).

For all of these reasons the narrow Nonnette exception does not prohibit application of the holding in Heck to plaintiff's case. Accordingly, the court will turn to the question of whether Heck bars this action because a judgment in plaintiff's favor would imply the invalidity of his criminal conviction for threatening, resisting, delaying and obstructing police officers in the performance of their duties.

### B. Application of Heck to this Case

It was previously noted that defendants had not provided this court with the transcript from plaintiff's criminal trial from which this court could determine the evidence and arguments presented to the jury which resulted in the guilty verdicts being returned against plaintiff. (Findings and Recommendations filed March 2, 2005 at 17.) With their second summary judgment motion defendants have submitted a copy of the reporter's transcript from plaintiff's criminal trial. (Defs.' State. of Undisputed Material Facts filed April 29, 2005, Attach. Sarno Decl., Ex. A (Reporter's Transcript of Jury Trial in People v. Wesbecher, Case No. NCR86796 (Butte County Superior Court)) (hereinafter "RT"). At that trial Chico Police sergeant Laver testified that he responded to a call about a person who was refusing to leave the area of an AM-PM business in Chico. (RT at 13.) Upon arrival at the AM-PM, Sergeant Laver found plaintiff sitting in the rear of the business. (Id. at 13-17.) It appeared that plaintiff had been drinking and was under the influence of alcohol in violation of the terms of his probation. (Id.) After defendants Reichel and Krzyzek arrived, Sergeant Laver attempted to obtain an alcohol-level reading from plaintiff using a Breathalyzer-type preliminary screening device, since plaintiff was subject to alcohol testing at any time as a condition of his probation. (Id. at 16-19.) Although hindered by plaintiff's failure to provide a sufficient breath sample, there was an indication based on a partial sample that plaintiff's blood alcohol level was approximately .11. (Id. at 19-22.) Sergeant Laver then directed defendant Reichel to place plaintiff under arrest and transport him to Enloe Hospital for blood testing to accurately determine his blood-alcohol level. (Id. at 22-23.)

At plaintiff's criminal trial, defendant Reichel testified as follows regarding plaintiff's conduct upon arrival at the Enloe Medical Center.

> Q [Mr. Redelsperger, D.A.]: When you got out of your vehicle, what happened next?
>
> A [Reichel]: I exited my vehicle. I opened up the rear passenger door to have Mr. Wesbecher step out. As I opened the door, he started to lean across the seat so that I could not get a hold of him to remove him from the vehicle.
>
> Q. He was leaning away from you?
>
> A. Yes.
>
> Q. Is he still handcuffed?
>
> A. Yes.
>
> Q. As he's leaning away from you, what happened after that?
>
> A. I had several things go through my mind. I thought he might be leaning across the seat to possibly kick me. My reaction was to grab onto his left biceps to prevent him getting across the seat to possibly be able to kick me.
>
> Q. So what happened?
>
> A. I grabbed onto his left biceps, and as I did that, he tried to pull his arm from me. I was able to reach in with my hands. I had both my right and left hands on his biceps, trying to pull him towards me. And he continued to struggle, telling me, let go of him, trying to pull back across the seat.
>
> Q. Did you continue trying to get him out of the vehicle?
>
> A. Yes. I did not want him getting across the seat. I might get kicked. I didn't know what he would do if out of my reach.
>
> Q. So what happened after that?
>
> A. I continued to pull on his arm to have him come back towards the door and exit the vehicle. I was able to pull - - I had my entire body, up to my chest, in the door-frame and finally was able to pull him far enough to where he put one foot out, brought the left foot out and start to stand up.
>
> Q. As you were pulling him out the door-frame, what happened?

/////

1  A. I pulled him out, his left foot came out onto the ground. His head was still somewhat inside the vehicle, up against the door-frame. I was able to eventually get him out, clear the door-frame and start to stand up.

Q. At this point he had not been cooperating; is that correct?

A. That's correct.

Q. Were you yanking him out of the vehicle because you were upset by his failure to cooperate?

A. I was trying to pull him out of the vehicle. One, he didn't want to get out with his action, leaning across the seat, and he needed to go into the hospital to provide a blood sample. I was not manhandling Mr. Wesbecher.

Q. As you pulled him out of the vehicle, did you pull him out with such force to pull him out onto the street or just so you were able to stand him up?

A. So I was able to stand him up.

Q. So as you pulled him out of the door-frame, what happened next?

A. He had his left foot out. He started to stand up. He lost his balance and fell backwards. His arms were behind his back. He was handcuffed, and he landed on the ground.

Q. In what way did he land on the ground?

A. Both his hands were behind his back, and he just fell straight back and landed on his back on the ground.

Q. And given your physical size compared to Mr. Wesbecher, is he larger than you?

A. Yes, he is.

Q. In a substantial way?

A. Yes.

Q. When he started to lose his balance, did you attempt to stop that direction and right him so he would not fall?

A. I had a hold of his left biceps and I tried holding onto him but could not support his weight as he fell to the ground.

Q. Upon him hitting the ground, did he say anything?

11

1     A. Yes, he did.

2     Q. What was that?

3     A. He cried out in pain. He said that his arm was broken. He said I had broken his arm.

4

5     Q. Did he make any allegations against you.

    A. He told me that I had broken his arm.

6

7     Q. Based on him falling to the ground, did you attempt to get some help so he could seek some aid?

8     A. Yes. I saw a paramedic exit the emergency room known as Brian Simpson and called him to come over and help.

9

10     Q. Did he?

    A. Yes.

11

12     Q. At that point was Mr. Wesbecher cooperating with your directions?

13     A. No, he's not.

14     Q. In what way?

15     A. He was telling me to keep my hands off of him. I wanted to get him up on his feet so he was not laying on his arms. I did hear

16 what sounded like a bone breaking. I wanted to help get him off that arm and rolled him up to his side and stood him up.

17

    Q. Was he able at some point to get on his feet?

18

    A. Yes.

19

    Q. Is he cooperating once he's on his feet?

20

    A. No.

21

22     Q. In what way?

23     A. Pulling away from me. I wanted him to stand by the car. He told me to let go of him. I did let go of him. I thought that he wasn't happy with me. I let Officer Krzyzek hold onto him, and he

24 also tried to pull away from Officer Krzyzek.

25     Q. So when you let go, what did he do?

26 /////

12

A. Tried to pull away from Officer Krzyzek and turned his body so he was facing Officer Krzyzek.

Q. And were you trying to get some sort of transport for him into the hospital?

A. Yes, I was. I told the paramedic, Brian Simpson, to get a wheelchair and bring it out to our location to bring him in to get treatment.

(RT at 31-36.)

Defendant Krzyzek also testified at plaintiff's trial and his testimony supported and was consistent with that of defendant Reichel with respect to the events occurring at the hospital. (Id. at 47-50.) Likewise, Bryan Simpson, an emergency medical technician at Enloe Medical Center, provided the following testimony at plaintiff's criminal trial:

Q [Mr. Redelsperger]. What was happening in the parking lot when you got the call out from Officer Reichel, what was occurring?

A. I was hearing a lot of profanity, a lot of yelling.

Q. From who?

A. From him.

MR. REDELSPERGER: May the record reflect he's pointing to the defendant?

THE COURT: Record will so reflect.

MR. REDELSPERGER:
Q. What sort of profanity - - what was he saying exactly?

A. The "F" word, every word you can think of, very belligerent, yelling at the officer, just yelling out, being very belligerent.

Q. As far as that context that you observed, did you see the officer attempt to direct him to do certain things?

A. Yes. I ran over to the officer. The officer said, can you stand here until the supervisor gets here, to be a witness? And I said, yes. I stood there. Officer Reichel had backed off and actually was standing away from the defendant. And Officer - - I can't say his last name.

Q. Krzyzek?

13

1     A. Krzyzek, yes, had him bent over the back of the trunk.  He was yelling, my arm, you guys broke my f'ing arm, a lot of profanity.
2     The officer kind of, like, released him so he could stand upright so the guy would stop screaming and yelling.  And as he did so, he'd
3     then become more belligerent, and he put him back over, just sit him over the trunk to keep control of him.
4
      Q. When the defendant as directed to do certain things, was he
5     complying with those directives?

6     A. No.

7  (RT at 54-55.)  On cross-examination by defense counsel, medical technician Simpson further

8  testified to the following:

9     Q [Mr. Willis].  Did you observe the officer extracting Mr. Wesbecher from the vehicle?
10
      A. No, I did not.  He was out of the vehicle when I was called
11    over.

12    Q. And bent over the back of the vehicle?

13    A. Yes, frontwards.

14    Q. Over the trunk of hood or what?

15    A. The trunk.

16    Q. Did both officers have a hold of him at that time?

17    A. No.  Officer Reichel - - as I walked up, Officer Reichel was backing off, was stepping back.
18

19  (Id. at 56-57.)

20         At plaintiff's trial on the criminal charges defense counsel did not offer any

21  evidence but did make a closing argument to the jury in which he contended that the prosecution

22  had failed to prove its case beyond a reasonable doubt.  (Id. at 65-73.)[10]  The court then read the

23  instructions to the jury, which included the following:

24  ───────────────

25    [10] In its closing argument the prosecution argued the evidence established that from the AM-PM parking lot, during the ride in the police car and upon arrival at the hospital plaintiff had been combative, uncooperative, threatening and resistive toward the officers.  (RT at 61-64, 71-
26  74.)

14

> Every person who willfully resists, delays, or obstructs any peace officer in the discharge or attempt to discharge any duty of his office or employment and who knows or reasonably should know that the other person is a peace officer engaged in the performance of his duties, is guilty of a violation of Penal Code 148, subdivision (a)(1), a misdemeanor.
>
> \*\*\*
>
> [I]f you find that the peace officer used unreasonable or excessive force in making the arrest or detention, the person being arrested or detained has no duty to refrain from using reasonable force to defend himself against the use of excessive force.
>
> \*\*\*
>
> A peace office is not engaged in the performance of his duties if he makes or attempts to make an unlawful arrest, detention or uses unreasonable or excessive force in making or attempting to make the arrest, detention.
>
> If you have a reasonable doubt that the peace officer was making or attempting to make a lawful arrest, detention or using unreasonable force in making or attempting to make the arrest, detention and thus have a reasonable doubt that the officer was engaged in the performance of his duties, you must find the defendant not guilty.

(RT at 87-91.)

It is clear from the trial testimony set forth above that plaintiff was convicted of the criminal charges brought against him based upon the testimony of both the officers and the hospital medical technician regarding his resistive and combative conduct at the hospital both before and after his actual removal from the police car. According to the prosecution witnesses that combative conduct continued even after plaintiff was picked up off the ground and bent across the patrol car. The jury in plaintiff's criminal case obviously found that testimony persuasive in finding him guilty on both counts. The holding in <u>Heck</u> operates so as to bar excessive force claims by a plaintiff convicted by a jury of resisting arrest, unless the defendants allegedly used excessive force before or after the period when plaintiff was resisting. <u>Smith v. City of Hemet</u>, 394 F.3d 689, 695-97 (9th Cir. 2005) (en banc); <u>El v. Crain</u>, 2008 WL 2323524 at \*12. Here, plaintiff's criminal conviction was based on his conduct during a series of events

beginning with his threats to the officers, escalating to his refusal to exit the squad car peaceably, through his fall to the ground and concluding to his continued resistance even after he was picked up off the ground. Under these circumstances, Heck bars plaintiff's excessive use of force claim since a verdict in his favor on that claim would imply the invalidity of his criminal conviction for resisting, obstructing, delaying and/or threatening police officers in violation of California Penal Code §§ 69 and 148(a)(1). See Cunningham v. Gates, 312 F.3d at 1154-55 (because the plaintiff's provocative act and the police response thereto were so closely interrelated, plaintiff's conviction foreclosed his excessive use of force claims against the officers under Heck); El v. Crain, 2008 WL 2323524 at *12.

## CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Defendants Reichel and Krzyzek's second motion for summary judgment filed on April 28, 2005, be granted; and

2. This action be dismissed without prejudice.[11]

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fifteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within five days after service of the objections. The parties are advised

/////

/////

/////

---

[11] See Weilburg v. Shapiro, 488 F.3d 1202, 1206 n.4 (9th Cir. 2007) (Heck dismissal should be without prejudice so as to permit plaintiff to bring a civil action anew in the event he ever succeeds in invalidating the underlying conviction); Trimble v. City of Santa Rosa, 49 F.3d 583, 585 (9th Cir. 1995).

that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: June 30, 2008.

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:4
wesb2410.57c